IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States,<br>        Plaintiff,<br>    v.<br>Justin Prometheus Dorsey,<br>        Defendant. | Case No. 22-cr-00129-CRB-1<br><br>**ORDER DENYING MOTION TO SUPPRESS** |

Defendant Justin Prometheus Dorsey ("Dorsey"), charged with a violation of 18 U.S.C. § 922(g)(1) for possession of a firearm while on parole, moves to suppress, inter alia, the firearm found in a search of his Toyota Prius. See Mot. (dkt. 41).

On February 10, 2022, under the guise of a traffic stop, police pulled over a Ford Explorer while Dorsey was in the backseat. The officers then ran a records search for the driver and passengers and learned that Dorsey was on parole. Through a search of the backseat of the car, the officers found the key fob to Dorsey's Toyota Prius. After taking Dorsey back to the station and performing a records search of his vehicle, another officer, armed with the key fob found in the search of the Explorer, combed the neighborhood for Dorsey's Prius, found it, searched it, and recovered the firearm that forms the basis of the charge.

Because police had probable cause to conduct the initial search of the Ford Explorer, and the subsequent search of Dorsey's Prius was a valid parole search, Dorsey's motion is DENIED.

## I. BACKGROUND

Based on police reports, body camera footage, and declarations from officers and witnesses, the following occurred on February 10, 2022:

### A. Officer Ochoa's Observations

Officer Ochoa was working in the Bayview district, conducting surveillance on Quesada Avenue at 3rd Street. See Larouche Decl. (dkt. 42) Ex. G. Ochoa Report at 7. At the time, Ochoa was assigned to the Community Violence Reduction Team, dressed in plainclothes in an unmarked police vehicle. Id. Ochoa observed a Silver Ford Explorer double parked in the street, blocking a lane of traffic, and "at one point there were numerous people leaning into the Ford and others congregating around it." Id. Based on Ochoa's knowledge of the area, which is "well known [as] an area to purchase illegal street narcotics," Ochoa "believed the activity around the Ford was narcotics based." Id.

During his surveillance of the Explorer, Ochoa observed "a number of individuals enter and exit the vehicle a number of times," and "was able to see a front occupant conduct [what Ochoa understood to be] a hand-to-hand narcotics transaction." Id.[1] Ochoa saw the "front occupant" receive[] cash from an individual outside the vehicle, and saw "one of the front occupants of the front seats of the Ford hand a 'pack' back to the [individual]." Id. The "pack" that Ochoa observed "was a white color." Id.[2] While Ochoa states that he "recognized [the pack] from plain view," he also states that he was using binoculars at various points during his surveillance of the Explorer. Ochoa Decl. ¶ 9.

A declaration from Deshawn Davis, the front seat passenger of the Explorer when the eventual stop occurred, calls Ochoa's observations into question. Davis states that he

---

[1] In a declaration filed in support of the government's opposition to the motion, Ochoa states that he was "located about 20-30 yards away from the Explorer on the opposite side of the street" when he observed the "hand-to-hand narcotics transaction[]", and his "line of sight was not impaired by any obstacles." Paulson Decl. (dkt. 44) Ex. 3 Ochoa Decl. ¶¶ 8–9.

[2] In his declaration, Ochoa states that the "packs" "often have a decorative label/advertisement on one side," but he does not report seeing such a label on the pack he observed being handed off from the Explorer. Ochoa Decl. ¶ 9.

2

was parked at Quesada and 3rd Street when Slaughter drove up next to him in the Explorer. Second Larouche Decl. (dkt. 48) Ex. S Davis Decl. ¶ 1. Davis had a clear view into the Explorer when it was parked at Quesada and 3rd Street—the time that Ochoa states that he saw the drug transaction occur—and Davis did not see anyone approach the Explorer and receive a pack in exchange for cash, as Ochoa observed. Id. ¶¶ 2–3.

Ochoa then observed two individuals[3] enter the Explorer and they drove away shortly later. Ochoa Report at 7. Ochoa followed the vehicle, observing it running stop signs and "driv[ing] at a high rate of speed passing through a residential neighborhood." Id.

### B. Stop and Search of the Ford Explorer

At approximately 1:03 p.m., Officer Ochoa requested assistance with a stop of the Ford Explorer.[4] Larouche Decl. Ex. E Hawkins Report; see also Larouche Decl. Ex. B CAD Audio Part 1 at 00:03 ("Is there a . . . marked unit that can do an investigative stop for me?"). Officers Hawkins and Ortiz responded to the request, and observed the Ford Explorer parked in a red zone and blocking the crosswalk, stopped outside of a store while the driver went inside. Hawkins Report. Ochoa informed Hawkins and Ortiz that the stop was "just an investigative stop" because he wanted to "ID the driver." CAD Audio Part 1 at 00:45 ("Just need the driver ID'ed . . . they've been running stop signs.").[5] Ochoa instructed Hawkins and Ortiz to wait until the Explorer "start[ed] moving again with

---

[3] Both Ochoa's observations and Davis's declaration confirm that these two individuals were Deshawn Davis and Justin Prometheus Dorsey. See, e.g., Davis Decl. ¶ 4. The parties appear to agree that Davis and Dorsey were not seated in the Explorer when the drug transaction Ochoa alleges that he observed occurred, but Davis alleges that he was parked next to the Explorer the whole time it was parked on Quesada and 3rd Street. Id. ¶ 1.

[4] In his report, Ochoa characterizes the request as follows: "I then broadcast over my pic radio and requested a marked SFPD police unit to respond and aid me in my investigation." Ochoa Report at 7. The dispatch record includes a request for a "marked unit" to assist with a "suspicious vehicle" that has been "running stop signs." See Larouche Decl. Ex. P Dispatch Record at 1.

[5] After requesting the stop, Ochoa asked that the responding unit call him on a private line. See CAD Audio Part 1 at 01:26 ("Can the unit that's coming, can you just give me a call real quick? It's Ochoa."). Neither Ochoa's report nor Hawkins' report references this call, and it is not picked up by either Ortiz or Hawkins' body camera footage, though it seems to have occurred. See CAD Audio Part 2 at 00:18 ("It's definitely just an investigative stop, we just want to stop and ID the driver. The unit has instructions [sic] too many people.").

3

everyone back inside." See Dispatch Record at 1; CAD Audio Part 3 at 00:10 ("Can you hold off for a second? We're going to wait until the car starts moving again and all the occupants inside.").

After the driver got back in the Explorer and drove away, Officers Hawkins and Ortiz stopped the Explorer. See Hawkins Report. Before they got out of the car, Ortiz asked Hawkins why they were stopping the Explorer. See Larouche Decl. Ex. I Ortiz BWC at 00:38. Hawkins said that their orders were to "ID the driver" because "he rolled that last stop sign." See Larouche Decl. Ex. J Hawkins BWC at 00:38. Hawkins and Ortiz approached the Explorer and requested identification from the driver, Joseph Slaughter, who Officer Ortiz recognized. Ortiz BWC at 00:45. Ortiz and Hawkins ran Slaughter's information and found that he was not on probation or parole. See Ortiz BWC at 1:30; Hawkins BWC at 2:05. Ortiz asked Hawkins, "That's it, right? Just a warning?" Hawkins initially agreed, but then decided to call a supervisor, Officer Reavey, to see if he needed anything else from the stop. See Ortiz BWC at 2:07; Hawkins BWC at 2:10. Hawkins asked Reavey if he needed anything besides identification of the driver, and Reavey responded, "If you can, get IDs for the other people in the car, that would be awesome. And if there is any type of probation or parole, uh, search it." Hawkins BWC at 2:45.

Ortiz and Hawkins returned to the Explorer and asked the two passengers, Deshawn Davis and Justin Prometheus Dorsey, for identification. Id. at 4:10. Davis provided his identification, and Dorsey provided his name and date of birth, because he did not have identification on him. Id. at 4:20–5:00. The officers ran a parole search and, after confirming his middle name, discovered that Dorsey was on active parole.[6] Id. at 9:00–10:00. Hawkins went back to the Explorer and, after confirming with Dorsey that he was

---

[6] In his report, Ochoa claims that he knew Dorsey and Davis "through numerous street contacts, investigations, and arrests," and knew that Dorsey was "on active CDC parole with a full search condition." Ochoa Rep. at 8. Dorsey's search condition is as follows: "You, your residence, and any property under your control are subject to search or seizure by a probation officer, an agent or officer of the California Department of Corrections and Rehabilitation, or any other peace officer, at any time of the day or night, with or without a search warrant, with or without cause." See Paulson Decl. Ex. 1 Notice and Conditions of Parole at 1.

4

on active parole, instructed Dorsey to get out of the Explorer. Id. at 10:25. Hawkins observed Dorsey lean forward and "appear[] to hesitate," reaching with his right hand "down between his legs and toward the floorboard." Hawkins Report; Hawkins BWC at 10:44. Hawkins ordered Dorsey not to reach down, and Dorsey got out of the Explorer. See Hawkins Report; Hawkins BWC at 10:47.

Officer Reavey arrived to assist in the "parole search" of the Explorer. See Larouche Decl. Ex. F Reavey Report. Reavey found a backpack behind the driver's seat, with a handgun and three pill bottles inside, each with the name "Joseph Slaughter" on them. Id.[7] Reavey also uncovered Toyota car keys and a cell phone "on the floorboard where [Dorsey] was seated." Id. Ochoa then arrived on the scene and spoke to Reavey and Hawkins, who told Ochoa about the search and Dorsey's demeanor when he was asked to get out of the car. See Ochoa Report at 8. Ochoa knew that Dorsey drove a Toyota from his "prior observations and investigation," and between this knowledge, Dorsey's position in the backseat, and Dorsey's behavior, Ochoa "fully believe[d] that the keys and cell phone both belonged to Dorsey." Id.

The three men (and the Explorer) were then transported to Bayview station, where Slaughter and Dorsey were questioned. See id. at 8–9.

### C. Records Search and Search of the Toyota Prius

At Bayview station, Officer Taylor conducted a records search of Dorsey and his registered vehicles, and found a Toyota Prius, along with a license plate number, registered to Dorsey. Id. at 8. Officers Coleman, Freeman, Everson, and Sergeant McMillan then took Dorsey's keys back "to the area of Quesada and 3rd Street on a quest to locate Dorsey's registered vehicle." Id. Freeman located a blue Toyota Prius with a license plate matching that registered to Dorsey, parked on 3rd Street. Id.; see also Larouche Decl. Ex. H Coleman Report. Using the key fob obtained from the search of the Explorer, Freeman

---

[7] Later, during a further search of the backpack at the station, Officer Reavey found "several small sealed bags with the words Gelati cannabis flower on them," which Reavey believed to contain marijuana. Reavey Report.

5

1  unlocked the Prius. See Coleman Report. During the search of the Prius, the officers

2  found mail with Dorsey's name, as well as a firearm with a high-capacity magazine under

3  the driver's seat. See id.

4  Dorsey brings this motion to suppress "all the fruits of the officers' constitutional

5  violations—[including] physical evidence and Mr. Dorsey's statements" during his

6  interview. Mot. at 16.[8] The motion is now fully briefed, and the Court held a hearing on

7  the motion on February 15, 2023. See Opp'n (dkt. 44); Reply (dkt. 47); see also dkt. 53.

## II. LEGAL STANDARD

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Unless an exception applies, the exclusionary rule prevents unlawfully obtained evidence from being introduced at trial against the person whose Fourth Amendment rights were violated. See Mapp v. Ohio, 367 U.S. 643, 655 (1961). This includes other evidence "come at by exploitation of that illegality." Wong Sun v. United States, 371 U.S. 471, 488 (1963) (quotation omitted).

## III. DISCUSSION

Dorsey argues that police violated the Fourth Amendment in two ways: First, by unconstitutionally prolonging the stop of the Explorer, which led to the recovery of the key fob to Dorsey's Prius; and second, by searching Dorsey's Prius when that search was not permitted under his parole search condition.

### A. The Search of the Ford Explorer

Dorsey argues that the fruits of the search of the Explorer should be suppressed because they were found due to an unconstitutionally prolonged traffic stop. Mot. at 8–11. The government does not dispute that, if the stop of the Explorer had been an ordinary

---

[8] In its opposition, the government contends that it "is not seeking to admit any of Dorsey's Mirandized stat[ements]," and thus "the Court need not address this issue." See Opp'n at 17 n.3. Dorsey, not reasserting Miranda violations in his reply, appears to agree. As a result, this order addresses only suppression of the fruits of the searches of the Explorer and the Prius, not any statements made by Dorsey in his interview.

traffic stop, then it would have been unlawfully prolonged by the parole search of the passengers, Davis and Dorsey. See Opp'n at 12–13; United States v. Landeros, 913 F.3d 862, 868 (9th Cir. 2019) ("A demand for a passenger's identification is not part of the mission of a traffic stop.").[9] Instead, the government argues that Ochoa's observations prior to the stop gave the police probable cause to search the Explorer for evidence that a crime had been committed. See Opp'n at 12–13.

### 1. Probable Cause

Police may "conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband." United States v. Fowlkes, 804 F.3d 954, 971 (9th Cir. 2015) (quoting United States v. Pinela-Hernandez, 262 F.3d 974, 977–78 (9th Cir. 2001)); see also California v. Acevedo, 500 U.S. 565, 569 (1991) (citing Carroll v. United States, 267 U.S. 132, 151 (1925)). Probable cause exists when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). This "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983). Officers may rely on their specialized knowledge and training to draw inferences from their observations, United States v. Arvizu, 534 U.S. 266, 273 (2002), and when officers are acting in concert, the Ninth Circuit instructs courts to "look[] to the collective knowledge of all officers involved in the criminal investigation." Fowlkes, 804 F.3d at 971 (quoting United States v. Ramirez, 473 F.3d 1026, 1032–37 (9th Cir. 2007)).

The government maintains that police had probable cause to search the Explorer for three reasons: First, Ochoa observed the Explorer parked at Quesada and 3rd Street, a "well-known area in which to sell and purchase illegal street narcotics." Opp'n at 12; see also Ochoa Report at 7. Second, Ochoa observed that the Explorer stood out, because it

---

[9] Nor does the government argue that the search of the Explorer was a valid parole search of Dorsey, because Hawkins and Ortiz did not learn that Dorsey was on parole until after the "traffic" stop had already been unlawfully prolonged.

7

was double parked in the middle of the roadway, often had multiple people congregating around it, and he observed people getting into and out of the Explorer. Opp'n at 13; see also Ochoa Report at 7; Ochoa Decl. ¶ 7. Third, Ochoa reports observing what he interpreted as a drug transaction, the transfer of a "pack" from someone in the Explorer to someone outside the Explorer in exchange for cash. Opp'n at 13; see also Ochoa Report at 7.

While the first two reasons do not, by themselves, amount to probable cause to believe that the Explorer contained contraband, the third reason—the observed exchange of the "pack" for money—in concert with the other facts and circumstances present, does. In Fowlkes, as in this case, the ordering officer "had just observed what [he] believed . . . to be a narcotics transaction" in the vehicle in question, and asked a marked unit to execute "a pretextual traffic stop" of the vehicle. 804 F.3d at 958–59, 971. This observation of what the officer believed to be a narcotics transaction gave that officer "probable cause to believe that [the vehicle] contain[ed] [other] contraband." Pinela-Hernandez, 262 F.3d at 977–78.[10]

Dorsey calls Ochoa's stated observations of a drug transaction into question, pointing out inconsistencies between Ochoa's report and his declaration, and putting forth a declaration from a passenger of the Explorer, Deshawn Davis, who denies observing a

---

[10] Dorsey does not persuasively distinguish Fowlkes. It is true that "the officers in Fowlkes had a fulsome investigation of a known individual that included statements by the defendant regarding his contraband, a prior search revealing defendant had narcotics and a firearm, and two observations of the defendant engaging in drug sales," and that Ochoa's investigation into the passengers and driver of the Explorer was, from this record, comparably less "fulsome." Reply at 6–7. But what controls the probable cause determination here is whether the officers had probable cause to believe that the vehicle contained contraband, not whether the parties involved were engaged in a long-term criminal scheme. Pinela-Hernandez, 262 F.3d at 977–78. As a result, the Fowlkes Court did not rely primarily on the prior investigation of Fowlkes, but upon the fact that the officers involved "had just observed what they believed, based on previous surveillance of Fowlkes and their own experiences, to be a narcotics transaction" in the vehicle. 804 F.3d at 971 (emphasis added). Compare, e.g., United States v. Lawson, No. 15-CR-00119-PJH-1, 2016 WL 658796, at *27 (N.D. Cal. Feb. 18, 2016) (finding that, despite a DEA investigation and a confidential informant's statement two months prior that the car had been driven to pick up drugs, there was not probable cause to search the vehicle two months later, because "the government does not establish a sufficient nexus between defendant's car and the past indicia of drug trafficking activity to support a fair probability that evidence of a crime would be found in the Bentley"), aff'd, 721 F. App'x 722 (9th Cir. 2018), and aff'd, 731 F. App'x 663 (9th Cir. 2018).

transaction occurring while he observed the Explorer parked at Quesada and 3rd Street. Neither of these showings implicate Ochoa's credibility such that an evidentiary hearing is required.

First, the inconsistencies Dorsey points out are so minor as to be de minimis: For example, in his report, Ochoa claims that he understood the packs to "contain[] a variety of narcotics," but in his declaration, he adds that the packs are "primarily used to sell marijuana . . . , but are also used to sell other drugs." Ochoa Report at 7; Ochoa Decl. ¶ 9. In addition, Ochoa's report states that the "pack" he saw in the alleged transaction was "a white color," but in his declaration, states additionally that the "packs" "often have a decorative label/advertisement on one side." Ochoa Report at 7; Ochoa Decl. ¶ 9. It is understandable that, if he was conducting surveillance twenty or thirty yards away, see Ochoa Decl. ¶ 8, that Ochoa would not have been able to determine whether there was a decorative advertisement on the side of the "pack," or the particular drug it was likely to contain. These minimal inconsistencies do not call into question the basic fact alleged: that Ochoa states that he observed a "pack," likely to contain drugs, handed off from someone inside the Explorer to someone outside of it. Ochoa Report at 7.

Nor does Davis's declaration call Ochoa's credibility into question. Davis states that he was not in the Explorer for much of the time it was parked at Quesada and 3rd Street; instead, he "leaned into the Explorer and socialized with Mr. Slaughter and others during this time." Davis Decl. ¶ 1. While Davis states that "from what [he] could see and observe, at no time did I or anyone in the Explorer hand anyone outside of the vehicle a pack or baggie," Davis was not engaged in surveillance of the people in the Explorer, as Ochoa was; and he does not state that he kept tabs on the people entering and exiting the Explorer or congregating around it, as Ochoa did. Further, Davis states that while he was "at or near the Explorer, [he] had a clear view into the Explorer and clear view of anyone who would have approached the Explorer," but he would only have such a clear view if all

9

of the windows were open,[11] which Davis does not clarify. Id. ¶ 3. Thus, it is possible that Davis could have missed the exchange of a pack with someone outside of the Explorer if that exchange happened on the opposite side of the car from where Davis was parked, or if one of the windows was closed, blocking Davis's view. Therefore, assuming that Davis's declaration is true, it still does not provide evidence that Ochoa's report and observations are false.

Finally, Ochoa's request for a marked unit provides further evidence that this was an investigatory stop based on prior observations, rather than a mere traffic stop. On the dispatch record, Ochoa states that he needs help with an "investigative stop." See CAD Audio Part 1 at 00:03 ("Is there a . . . marked unit that can do an investigative stop for me?"). After Hawkins and Ortiz responded to the request, Ochoa asked them to call him, presumably to give them more details on the mission of the stop. See id. at 01:26 ("Can the unit that's coming, can you just give me a call real quick? It's Ochoa."). Ochoa later references the call again on the dispatch, noting that the call gave Hawkins and Ortiz "instructions" for the stop. See CAD Audio Part 2 at 00:18 ("It's definitely just an investigative stop, we just want to stop and ID the driver. The unit has instructions [sic] too many people."). While there is no record of this call on Hawkins and Ortiz's body worn cameras—those recordings start just prior to the stop, and after the call seems to have occurred—the most likely conclusion is that Ochoa called Hawkins and Ortiz to give them more details of what he observed on Quesada and 3rd Street, the true investigative purpose of the pretextual stop.[12]

---

[11] Later, during the stop of the Explorer, Hawkins asked Dorsey to roll down the backseat window to talk to him, because, given the tint of the Explorer's windows and the sunny day, Hawkins could not see Dorsey properly through the glass. Hawkins BWC at 4:40.

[12] Dorsey also argues that, following Judge Berzon's concurrence in United States v. Magallon-Lopez, 817 F.3d 671, 676–78 (9th Cir. 2016), he has a constitutional due process right to be informed of the true basis of the stop of the Explorer and his subsequent arrest. See Reply at 17. But in Magallon-Lopez, it was undisputed that police lied when they told the defendant that the stop was based on a traffic violation that had never occurred. Id. at 673–74. Dorsey does not dispute that Ochoa observed a traffic violation, which served as an independent basis for a traffic stop of the Explorer; it was just not a basis for the prolongation of the stop, nor a basis for the search of the Explorer. "This is therefore not the occasion to consider whether or not there exists a 'due process (not Fourth Amendment) based right to be informed of the true basis for a stop or

1    Overall, Dorsey does not provide sufficient evidence to doubt the veracity of
2    Ochoa's observations, and thus, based on those observations and Fowlkes, police had
3    probable cause to search the Explorer for evidence that a crime had been committed.

### B.     The Search of Dorsey's Toyota Prius

Having determined that the fruits of the search of the Explorer need not be suppressed, the question is then whether the fruits of the parole search of Dorsey's Prius (including the firearm that forms the basis of the charge) must be suppressed.

Because parolees "have severely diminished expectations of privacy by virtue of their status alone," and the state's interest in supervising parolees and reducing recidivism is "substantial," parolees may constitutionally be subject to broad, suspicionless search conditions. Samson v. California, 547 U.S. 843, 852–53 (2006). There are only a few limitations on this power. First, the police must know that the search condition applies; that is, they must know that the person to be searched is on parole. United States v. Caseres, 533 F.3d 1064, 1075–76 (9th Cir. 2008) ("The search condition validates a search only if the police had advance knowledge that the search condition applied before they conducted the search."). Second, the police must "have probable cause to believe that the [parolee] owns or controls the vehicle to be searched." United States v. Dixon, 984 F.3d 814, 822 (9th Cir. 2020). Third, the search cannot be "arbitrary, capricious, or harassing." See United States v. Korte, 918 F.3d 750, 754 n.1 (quoting Cal. Penal Code § 3067(d)).[13] The parties do not dispute that Dorsey is subject to the following parole search condition:

> You, your residence, and any property under your control are subject to search or seizure by a probation officer, an agent or officer of the California Department of Corrections and Rehabilitation, or any other peace officer, at any time of the day or night, with or without a search warrant, with or without cause.

See Paulson Decl. Ex. 1 Notice and Conditions of Parole at 1.

Dorsey argues that the fruits of the search of the Prius should be suppressed for two

---

arrest.'" United States v. Ortiz, No. 5:14-CR-00028-EJD, 2018 WL 3208154, at *4 n.3 (N.D. Cal. June 29, 2018) (quoting Magallon-Lopez, 817 F.3d at 677 (Berzon, J., concurring)).
[13] Dorsey does not argue that the search of the Prius was arbitrary, capricious, or harassing.

11

reasons: First, the use of Dorsey's key fob (recovered from the search of the Explorer) to locate his Prius was an unlawful search; and second, the Prius was not "property under [Dorsey's] control" and thus not subject to search under his parole search condition.[14]

### 1. The Key Fob "Search"

Dorsey argues that the use of Dorsey's key fob to unlock the Prius constituted an unlawful search. Reply at 13–14. This argument fails for two reasons.

First, no court has held that such an action constitutes a search, and such that Dorsey relies on the Ninth Circuit's conclusion in United States v. Dixon that insertion of a key into a lock constitutes a search, that case explicitly relied on the Supreme Court's theory of physical trespass from United States v. Jones. See Dixon, 984 F.3d at 819–21 ("When Officer Ochoa inserted the key into the minivan's lock, an 'effect,' he physically intruded onto a constitutionally protected area."); see also United States v. Williams, 773 F.3d 98, 105 (D.C. Cir. 2014) ("Neither this circuit nor any other has held that an officer's warrantless activation of a key fob to locate the vehicle to which it corresponds constitutes a search, let alone an unconstitutional one."); United States v. Cowan, 674 F.3d 947, 955–56 (8th Cir. 2012) (holding that the use of a key fob is not a search under Jones or Katz because the defendant "did not have a reasonable expectation of privacy in the identity of his car" and "the mere transmission of electronic signals alone is not a [physical] trespass").[15]

---

[14] Dorsey makes two additional arguments related to this search: First, he argues it is unclear whether the officers knew about Dorsey's parole condition; and second, that the fruit of the search of the Prius should be suppressed as fruit of Dorsey's unlawful arrest. Reply at 16–17. As to the first argument, Dorsey points to declarations from Ochoa and Coleman, as well as the government's opposition, each stating that police were aware that Dorsey was subject to a search condition on February 10, 2020, not 2022. This is likely a typo; in any case, there is other evidence clearly indicating that the police knew that Dorsey was on parole and subject to a search condition on February 10, 2022. See, e.g., Hawkins BWC at 9:00–10:25. As to the second argument, the key to the Prius was recovered not as a result of Dorsey's arrest, but as a result of the search of the Explorer, which was based on probable cause. See supra Section III.A.1.

[15] Dorsey argues that a physical trespass occurred here because "[t]he physical trespass of pushing the key fob's button to obtain information constitutes a search under Jones." Reply at 14. But the question is not whether police touched the key fob itself; the question is whether police trespassed on other "property under [Dorsey's] control" subject to search, in this case, the Prius. A physical trespass on the Prius does not occur from pressing the button on the key fob. See Cowan, 674 F.3d at 956.

12

Second, and more fundamentally, even if the use of a key fob to locate a vehicle constitutes a search, the police in this case already had probable cause to believe that the Prius belonged to Dorsey, because the license plate matched the registration they had found through the records search. Compare Dixon, 984 F.3d at 819 ("In this case, the police [had probable cause to believe that Dixon owned or controlled the vehicle] only when they inserted the key that Dixon had dropped into the car lock, thereby confirming that he exercised control over the minivan."), with Coleman Report (explaining that Officer Freeman observed that the license plate of the Prius matched vehicle registered to Dorsey from the records search, before using the key fob to unlock the Prius).

Thus, even if the use of the key fob constitutes a "search," police did not need the key fob search to confirm that the Prius belonged to Dorsey, because they already had probable cause to believe that it did.

### 2. Dorsey's Parole Search Condition

Finally, Dorsey argues that the Prius was not "under his control,"[16] and, accordingly, was not subject to search under his parole search condition.

Property is "under [a parolee's] control" when a parolee "exhibit[s] a sufficiently strong connection to [the property in question] to demonstrate 'control' over it." United States v. Grandberry, 730 F.3d 968, 980 (9th Cir. 2013). The California Supreme Court has held that "the limits of a parole search flow from the nexus between the parolee and the area or items searched," including "the nature of that area or item," and "how close or accessible that area or item is to the parolee." People v. Schmitz, 55 Cal. 4th 909, 923, 930 (2012). This "nexus between the parolee and the area or items searched" may turn on "close physical proximity," as Dorsey argues, but it need not. See Reply at 14–15. The Ninth Circuit's discussion of a similar issue in United States v. Cervantes, 859 F.3d 1175

---

[16] It is undisputed that a car can be "property" within the meaning of Dorsey's search condition. See People v. Schmitz, 55 Cal. 4th 909, 926 (2012) (applying the same language to allow the search of the backseat of a car where the defendant was sitting); see also Korte, 918 F.3d at 754–55 (applying the same language to allow the search of the trunk of the defendant's car); United States v. Simon, No. 21-CR-00352-JSW-1, 2022 WL 797016, at *7 (N.D. Cal. Mar. 16, 2022).

13

(9th Cir. 2017), clarifies the nature of this "nexus" between parolee and the property he controls.

In Cervantes, the Ninth Circuit applied a mandatory supervision search condition authorized warrantless, suspicionless searches of "premises . . . under [Cervantes'] control." Id. at 1182. In 2015, while serving his term of mandatory supervision from a prior conviction, Cervantes and his girlfriend were stopped for jaywalking in Huntington Beach. Id. at 1179. After the officer confirmed that Cervantes was subject to a search condition, the officer searched Cervantes and found a key to the Ayres Hotel, located a little less than two miles away; Cervantes explained that he and his girlfriend had rented a room there. Id. The officer then let Cervantes and his girlfriend go and went to the Ayres Hotel to search their room. Id. Thus, the question was whether the stop of Cervantes and the search of his person, revealing the room key, gave the officer probable cause to believe that the hotel room was "under [Cervantes'] control." Id. at 1183. The Ninth Circuit held that it did, for two reasons: First, Cervantes told the officer that he and his girlfriend were renting the room together, even though she paid for the room with her credit card; and second, Cervantes possessed a key to the room. Id.

Just as the hotel room was under Cervantes' control because he had a key to it—and thus "had the ability to exert control over it"—so too was the Prius under Dorsey's control because he had possessed the key to it, because the key was found on the floorboard below where he was sitting in the Explorer. In fact, this case may be even more clear than Cervantes, because the Prius was registered to Dorsey, whereas in Cervantes, the hotel room was rented under his girlfriend's credit card. And critically, the Ninth Circuit did not consider Cervantes' physical proximity (or lack thereof) to the Ayres Hotel to be dispositive—Cervantes was approximately two miles from the hotel when he was stopped for jaywalking.

At the hearing on this motion, Dorsey argued that two facts distinguish Cervantes from this case: First, the police did not confiscate Cervantes' key, as they did here; and second, the police let Cervantes go prior to searching his room at the hotel, and here,

14

Dorsey was detained at Bayview station when the officers searched his Prius. Put differently, Dorsey argues that when the search of Cervantes' hotel room occurred, he still had "control" over the premises, because he still had his room key, and he was free to go back to his room at any time; but Dorsey no longer had "control" over his Prius once his keys were confiscated and he was detained.

But this was not the Ninth Circuit's rationale in Cervantes, and for good reason: If Dorsey's construction was the controlling rule—and a parolee must retain "control" over his property throughout his encounter with police—police could no longer search any property they had recovered from searches of parolees, if the parolee was still detained when the subsequent search occurred.[17] To avoid this incongruent result, the parolee must have "control" of the property not during the subsequent search of the property, but during the initial search of the parolee—that is, during the search of Cervantes' person after he was stopped for jaywalking, and during the search of backseat of the Explorer.

Accordingly, applying Cervantes, the Prius was "property under [Dorsey's] control," and subject to search under his parole search condition.[18]

## IV. CONCLUSION

For the foregoing reasons, Dorsey's motion to suppress is DENIED.

**IT IS SO ORDERED.**

Dated: February 23, 2023

CHARLES R. BREYER
United States District Judge

---

[17] For example, consider a hypothetical discussed at the hearing on this motion: Police have discovered that a suspect, who is carrying a suitcase through an airport, is subject to the same parole condition as Dorsey. Police then seize the suitcase and detain the parolee, as they are allowed to do. See Opp'n Ex. 1 ("You, your residence, and any property under your control are subject to search or seizure . . . ."). Under Dorsey's proposed rule, while the suitcase is seized and the parolee is detained, the parolee would not have "control" of the suitcase, and police would be unable to search inside it. Police would need to take the absurd step of releasing the parolee and giving them back "control" of their "property" before police would be able to search inside the suitcase.

[18] The Court recognizes that this is an important, close question of law that the Circuit may wish to review. To that end, the Court would consider a stipulated facts trial or a conditional plea.

15